MARC COLEMAN, Esq., State Bar #110358
LAW OFFICES OF MARC COLEMAN
100 Oceangate, Suite 1200
Long Beach, California 90802
Telephone: (562) 432-8188
marc@marccolemanlaw.com

Attorneys for Defendant ILWU LOCAL 26

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENOCH GREENE, an individual;<br><br>　　　　　Plaintiff,<br>　　v.<br><br>LBCT LLC, a Limited Liability Company; PACIFIC MARITIME ASSOCIATION, a California Nonprofit Corporation; APM TERMINALS PACIFIC LLC, a Limited Liability Company; ILWU LOCAL 26, Union; TOTAL TERMINALS INTERNATIONAL LLC, a Limited Liability Company; SSA TERMINALS LLC, a Limited Liability Company; MATSON NAVIGATION COMPANY INC., a Corporation; and DOES 1 through 50, inclusive;<br><br>　　　　　Defendants | CASE NO.: 5:25-cv-01359-KK (CTSx)<br><br>[Assigned to the Honorable Kenly Kiya Kato– Courtroom #3]<br><br>**DEFENDANT ILWU LOCAL 26'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT**<br><br>**Date: July 16, 2026**<br>**Time: 9:30 a.m.**<br>**Place: Courtroom 3, 3rd Floor**<br><br>Complaint Filed: June 2, 2025<br>Trial Date:　　September 28, 2026 |

1

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...................................................................................2

II.    STATEMENT OF  FACTS.......................................................................3

    A.    The Collective Bargaining Agreement (between the Pacific Maritime Association and Local 26) Controls the Terms and Conditions for Watchmen, Including Greene, Working in the Joint Ports.......................................................................................3

    B.    The Collective Bargaining Agreement Sets Forth the Essential Job Functions of Local 26 Watchmen Jobs.......................5

    C.    The Port Watchmen Play an Important Role in National and Port Security...................................................................6

    D.    Greene was Unable to Perform the Essential Functions of a Watchmen's Job...........................................................7

    E.    Greene Caused Two Accidents Due to His Low Vision and Drove Company Vehicles in an Unsafe Manner Risking Injury or Death......................................................................10

    F.    Both Greene's Treating Doctor and the Joint Parties' Doctor Concluded Greene was Unable to Drive or be in Uncontrolled Traffic Areas in the Ports.................................................11

III.    ARGUMENT .........................................................................................12

    A.    Summary Judgment Standard ........................................................12

    B.    The Accommodation of a Specific Limited Job Which Greene Seeks is an Undue Hardship Because It Violates Express Rights Established by a Collective Bargaining Agreement..................................................................................13

TABLE OF CONTENTS AND TABLE OF AUTHORITIES IN SUPPORT OF DEFENDANT ILWU LOCAL 26'S MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

C.   Greene is Not a Qualified Disabled Person Because He Cannot Perform the Essential Functions of the Watchmen Position With or Without Reasonable Accommodation ...............................16

D.   Greene's Accommodation is Per Se Unreasonable Because it would Violate Legitimate Expectations of Local 26 Workers Under Their Collective Bargaining Agreement and Destroy the Dispatch System .......................................................17

E.   Greene is a Direct Threat to the Health or Safety of Others in the Workplace, Including Himself ...............................17

IV.    CONCLUSION ...............................................................................18

TABLE OF CONTENTS AND TABLE OF AUTHORITIES IN SUPPORT OF DEFENDANT ILWU LOCAL 26'S MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

Page

## CASES

*American Postal Workers Union v. Postmaster General*,
　781 F.2nd 772 (9th Cir. 1986)........................................................................14

*Balint v. Carson City*,
　180 F3d 1047 (9th Cir. 1999)...................................................................13, 14

*Bhatia v. Chevron USA, Inc.*,
　734 F.2nd 1382 (9th Cir. 1984)....................................................................14

*Boersig v. Union Electric Company*,
　219 F.3d 1816  (8th Cir. 2000) ..................................................................... 1

*Brigham v. Frontier Airlines, Inc.*,
　57 F.4th 1194 (10th Cir. 2023) ................................................................... 17

*Celotex Corp. v. Catrett*,
　477 U.S. 317 (1986) ....................................................................................12

*cf. US Airways, Inc. v. Barnett*,
　535 U.S. 390 (2002) .....................................................................................15

*Davis v. Florida Power and Light Company*,
　205 F.3d 1301 (11th Cir. 2001) .................................................................. 17

*Eckles v. Consolidated Rail Corp.*,
　94 F.3d 1041 (7th Cir. 1996).......................................................................... 17

*EEOC v. Geo Group, Inc.*,
　661 F.3d 265 (3rd Cir. 2010).....................................................................15

*EEOC v. Townley Engineering and Manufacturing Co.*,
　859 F.2nd 610 (9th Cir. 1988)..................................................................15

iii

*Fouche v. New Jersey Transit,*
    470 F.Appendix 96 (3rd Cir. 2012)..........................................................15

*Hanon v. Dataproducts Corp.,*
    976 F.2d 497 (9th Cir. 1992) .................................................................. 12

*Harrell v. Donahue,*
    638 F.3d 975 (8th Cir. 2011)...................................................................15

*Kennedy v. Applause, Inc.,*
    90 App.3rd 1477 (9th Cir. 1996).............................................................16

*Matsushita Electric Industry Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ................................................................................12

*Mayo v. PCC Structurals, Inc.,*
    795 F3d 941 (9th Cir. 2015)....................................................................17

*McKnight v. General Motors Corp.,*
    550 F. 3d 519 (6th Cir. 2008)..................................................................16

*Miller v. Port Authority of NY and NJ,*
    351 F.Supp.3d 762 (D. NJ 2018) ......................................................14, 15

*Opuku-boateng v. California,*
    95 F.3d 1461, 1468 note 11 (9th Cir. 1996)............................................14

*Transworld Airlines, Inc. v. Hardison,*
    432 U.S. 63 (1977) ..................................................................................13

*Tunis v. Public Services,*
    2026 U.S. District. LEXIS 45471 (D. NJ 2026) .....................................14

*Stanley v. City of Sanford, Fla.,*
    83 F4th 1333 (11th Cir. 2003)................................................................16

*Webb v. City of Philadelphia,*
    562 F.3d 256..........................................................................................14

iv

TABLE OF CONTENTS AND TABLE OF AUTHORITIES IN SUPPORT OF DEFENDANT ILWU LOCAL 26'S MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

*Willis v. Pacific Maritime Association,*
244 F.3d 675 (9th Cir. 2001) .................................................................. 17


**STATUTES**

42 USC §12111(3) ..................................................................................... 17

42 USC §12112(a) ..................................................................................... 16

42 USC §12112(8) ..................................................................................... 16

42 USC §12113(a) ..................................................................................... 17

Americans with Disabilities Act ............................................................... 16



**OTHER AUTHORITIES**

29 CFR §1630 ......................................................................................... 16,

29 CFR §1630.15 ....................................................................................... 17

29 CFR §1630.15(b) .................................................................................. 17

29 CFR §1630.15(c) .................................................................................. 17

29 CFR §1630.4 ......................................................................................... 16

29 CFR §1630.2(m) ................................................................................... 16

29 CFR §1630.2(r) ..................................................................................... 17

Federal Rule of Civil Procedure 56(a) ..................................................... 12

TABLE OF CONTENTS AND TABLE OF AUTHORITIES IN SUPPORT OF DEFENDANT ILWU LOCAL 26'S MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

# I.

# **INTRODUCTION**

Plaintiff Enoch Greene ("Greene"), a long-time member of Local 26, has become legally blind, suffering from a debilitating disease which has left him with no vision in his left eye and no peripheral vision in his right eye, rendering him legally blind according to his own doctor. His job up until late 2023 was as a Port Watchman working pursuant to the Collective Bargaining Agreement between Local 26 and the Pacific Maritime Association ("PMA"). The importance to Port security in the busiest port complex in the country, requires that Watchmen be able to check ID's, generate reports, see, move, observe, and drive and direct traffic in busy terminal operations which are ongoing all hours of the day and night and encompass many square miles of property, including multiple railroad operations, trucks used for labor and production as well as vendors, customers, and vessel operations.

In addition to securing the cargo, the Watchmen play an important role in national security in that the United States Coast Guard, pursuant to its MARSEC regulations requires a high level of performance by the security guards so as to prevent terrorism, contraband cargo, trespassing, illegal products, stowaways, and other things deemed threatening to the welfare of the United States, as well as each marine terminal.

In this environment, it is unrealistic to expect that a legally blind person can safely perform the essential functions of the Watchmen's job, which functions are clearly spelled out in detail in the parties' Collective Bargaining Agreement. Nor can the parties violate their bona fide seniority and dispatch system to carve out a specific job at a specific terminal, as doing so would upend the fair, equitable and collectively bargained dispatch rights of Local 26 members.

///

///

2

DEFENDANT ILWU LOCAL 26'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

## II.

## STATEMENT OF FACTS

**A.    The Collective Bargaining Agreement (between the Pacific Maritime Association and Local 26) Controls the Terms and Conditions for Watchmen, Including Greene, Working in the Joint Ports**

Local 26 of the International Longshore and Warehouse Union ("Local 26"), is a signatory to the ILWU Local 26 Watchmen's Agreement 2019-2025, which governs the terms and conditions of employment for Local 26 Watchmen working in the Joint Ports of Los Angeles and Long Beach ("the Watchmen's Agreement").  (Separate Statement of Uncontroverted Facts, Undisputed Fact ("UF") 1.)

Under the Watchmen's Agreement, Local 26 is the exclusive bargaining agent for all watchmen operating at eight autonomous terminals operated by four signatory employers. (UF #2) The employers bound by the agreement are Total Terminals, International, LLC, Stevedoring Services of America, APM Terminal Pacific, Ltd., and Long Beach Container Terminal, LLC. The Watchmen's Agreement binds the employers and all Local 26 members to its terms under Article 1A. (UF #2)

The Watchmen's Agreement dictates the exclusive method by which Local 26 Watchmen are assigned to work covered thereunder. The rules under the heading, Registered Watchmen Rules (pages 137 to 138), Registered Watchmen Dispatch Procedures, (pages 140 to 142), and Article 13, govern how watchmen seeking jobs out of the Union dispatch hall, including Greene, are dispatched on a daily basis to different employers. (UF #6)

The Joint Parties (Local 26 and PMA) have agreed to a dispatch procedure whereby Watchmen are dispatched under the terms of the Watchmen's Agreement on the basis of hours with the Local 26 member with the lowest hours being dispatched first. (UF #7)

The Watchmen's Agreement is a bona fide seniority-based system, which fairly and

3

DEFENDANT ILWU LOCAL 26'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

accurately reflects that all Local 26 Watchmen covered under the Agreement may not bargain or accept work assignments outside the process provided in the Watchmen's Agreement. Specifically, Article 13 states:

"Watchmen violating or gimmicking dispatch rules and procedures shall be subject to discipline up to and including deregistration." (UF #8)

Under the Watchmen's Agreement, Watchmen are required to accept assignments on the terminal to which they are dispatched.  Watchmen who either refuse the job or are not available for dispatch are to be charged with eight hours for their non-availability. (UF #9)

The dispatch rules under the Watchmen's Agreement are the only way in which "Hall Watchmen" (those assigned to the daily dispatch system) can be assigned to work. (UF #10) Specifically, Hall Watchmen, including Greene, are not allowed to negotiate or bargain for their own special job deals outside the Watchmen's Agreement dispatch procedure. (UF #11)

Watchmen working under the Watchmen's Agreement are not dispatched to specific jobs. They are given the option of various employers who place work orders to whom they can be assigned. (UF #12). They are then dispatched to a specific terminal with a start time. (UF #12)

Once assigned to a work shift at a specific terminal, there is no guarantee that a Watchman will work any specific job once assigned to an employer. In a given shift, Watchmen can and often do work various assignments over the course of one shift pursuant to Article 7B of the Watchmen's Agreement. (UF #13) Depending on a terminal's activity on a specific day, work activities frequently change on any terminal on most days for various reasons. (UF #14)

DEFENDANT ILWU LOCAL 26'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

**B.    The Collective Bargaining Agreement Sets Forth the Essential Job Functions of Local 26 Watchmen Jobs**

Each employer of Watchmen has its own list of "Watchmen's duties" set forth in the Watchmen's Agreement as "M" language (Watchmen's Agreement at pages 78 to 93). (UF #15) The "M" language establishes the agreed-upon essential functions for the Watchmen's duties at each terminal. (UF #16) Each terminal assignment, pursuant to the "M" language, includes the need to drive a motor vehicle, whether acting as security, transporting longshoremen, clerks or other persons on the terminal, escorting vehicles as needed and responding to emergencies as they occur and writing reports and photographing incidents as required. (UF #17)

In addition to the "M" language, Articles 1, 2, and 7 of the Watchmen's Agreement set forth additional duties of Watchmen, which are essential job functions. (UF #18) Under Article 1, "Watchmen may…be assigned to drive buses and/or vehicles, act as rovers, perform rail security, check ID's, prevent trespassers, etc." (UF #19). Article 2 defines the various Watchmen jobs, including being employed at the gangway of a ship to control the boarding of persons and for the protection of property against loss by theft and other causes directed by the employer. Article 2 also includes the duty of Watchmen to act as "rovers and bus drivers and vehicle operators and to be assigned to travel outside the terminal boundaries or within the facility to regulate vehicular and pedestrian traffic." (UF #19)

In addition to transporting individuals within the terminal, Watchmen are required to perform all duties associated with and in conjunction with rail security as designated by the Employer and to provide relief to all other Watchmen and also provide detainee and cabin watch in which shipboard personnel under detention are to be kept on the vessel. (UF #21) Article 7 of the Watchmen's Agreement requires watchmen to transport individuals to and from the vessel. (UF #22) Watchmen are required to maintain a valid

5

California driver's license, California Guard Card, TWIC (Transportation Worker Identification Card),  CPR/First Aid Card, and perform duties pursuant to Coast Guard requirements and regulations. (UF #23) Watchmen must also prepare security reports, inventory, security equipment, ensure that vehicular and equipment traffic is maintained at a safe speed and flowing smoothly in and out of the terminal and on the terminal, prepare security reports such as hazmat spills, accidents, broken seals, damaged equipment, health and safety issues, vehicle inspection logs, detainee and stowaway reports, daily log reports and other reports as needed. These are common duties across all terminals and these functions require good visual acuity in order to perform these jobs safely and accurately. (UF #24) In order to accomplish their work, driving is an essential function for several of the job duties for Watchmen. (UF #25)

**C.    The Port Watchmen Play an Important Role in National and Port Security**

As president of Local 26, Gratz sits as an ex-officio participant of the region's Area Maritime Security Committee - United States Coast Guard. This includes her attending meetings held within the Ports of Los Angeles and Long Beach to discuss various aspects of marine security. (UF #26) There are significant National Security and regional security issues with Port Security. At the May 8, 2025, meeting of the Central California Area Maritime Security Committee (CCAMSC), the group discussed the fact that there were 15 breaches of security and 19 suspicious activity reports during the prior period which ended March 31, 2025. These included "shared or altered TWICs" and a "rash of fraudulent Mexican commercial driver's licenses." Yusen terminal has reported a number of fraudulent Mexican driver's licenses individuals appearing to possess fraudulent TWIC cards. These are deficiencies which Local 26 Watchmen are expected to catch when they review TWIC cards to admit individuals on the terminal. (UF #27)

Under the Marine Transportation Security Act (MTSA), facilities are required to

6

check TWIC cards under Federal Regulations (33 CFR 105.255 and 33 CFR 101.515). The United States Coast Guard has recommended that terminals check for valid commercial truck driving credentials at entrance gates. (UF #28) Transient individuals attempting to come onto terminal property is another access challenge, as is container theft reported by break-ins on inbound container terminals. (UF #29)

Local 26 Watchmen are required to take and pass a Watchmen safety course. The Watchmen safety course requires good visual acuity. Watchmen are required to: (1) look for signs of nervousness; (2) compare the person in the picture to the person presenting; and (3) evaluate changes in appearance such as beards, masks, hoodies, glasses, etc. and look for signs of tampering on the TWIC cards. (UF #30) Local 26 is also required to adhere to the MARSEC (Marine Security Advisory Levels). In light of the Iranian conflict, the United States Coast Guard issued a bulletin reflecting the current MARSEC level remains at 1, given a lack of credible threats. However, the Coast Guard has recommended "collective vigilance across US ports and waterways in the physical domain and cyberspace is essential given the complexity of our Marine Transportation System (MTS)…and the vital role of maritime commerce to US economic prosperity and strategic mobility." (UF #31)

D.    **Greene was Unable to Perform the Essential Functions of a Watchmen's Job**

On or about February 21, 2023, Local 26 was first notified by Greene that he was being treated by Anne L. Coleman, M.D. ("Dr. Coleman"), and that he would be off work until April 2023. (UF #32)

On or about April 15, 2023, Gratz received a letter from Greene attaching a copy of a letter from Dr. Coleman reflecting his vision deficiencies and inability to operate passenger vehicles, vans, or buses. (UF #33)

On or about April 29, 2023, Greene wrote to Gratz notifying her that he is disabled

7

and that he had been reassigned to a different job by Sergeant David Pannell than he had been dispatched to. Upon investigation, Gratz learned that Greene had driven a pick-up truck while on duty under a working crane and she advised the Sergeant on duty, David Pannell, to have Greene call a replacement since he was not able to safely perform that job. Driving under a working crane is forbidden under our safety rules and that constitutes operation of his equipment in an unsafe manner. (UF #34) Driving under a working crane represents the danger of a container falling from the crane as which would crush the truck traveling underneath and constitutes a risk of injury or death. (UF #35) That same day, Greene complained that he had been harassed and discriminated against by David Pannell having accusing him of driving too slow and driving under the cranes and following him around on the terminal. (UF #36) On or about May 2, 2023, Greene requested reasonable accommodation by email directed to the Joint Port Watchmen's Labor Relations Committee ("JPWLRC"). (UF #37) Greene also complained that he had been fired because he had requested accommodation due to his inability to drive at LBCT, but the Union Vice President and Shop Steward Victor Gasset ("Gasset") responded that he had not been fired, he had been "reaped out" (i.e. required to call a replacement) when he could not fulfill the job duties. (UF #38 and UF #39)

On or about May 3, 2023, Gasset wrote to Gratz reflecting what had happened at Long Beach Container Terminal ("LBCT"). Specifically, Greene had been temporarily placed on the gangway in lieu of his dispatched job and Local 26 members were complaining because of favoritism apparently reflected in Greene's treatment. (UF #41) As to the temporary accommodation on May 3, 2023, at LBCT, this arrangement appeared to have occurred when LBCT and Greene entered into a private agreement in violation of the Watchmen's Agreement and had engaged in direct dealing between LBCT and Greene in violation of the Watchmen's Agreement. (UF #42)

On or about May 8, 2023, the Joint Parties convened a Joint Port Watchmen's

DEFENDANT ILWU LOCAL 26'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

Labor Relations Committee ("JPWLRC") Meeting to discuss accommodating Greene's vision deficiencies. Gratz attended, as did Union representatives and PMA members. (UF #43)

At the JPWLRC meeting, Greene complained about difficulties he had with operating vans, including tight-maneuvering, hard difficult traffic patterns, and he requested to be reassigned to other positions besides driving the van or the bus. (UF #44)

Greene requested to be assigned to the NOIT (North Operations Information Technology) office but at the same time, he indicated that he may not be able to do all the work there because the angles at the main gate at the NOIT compromised his ability to perform the function. (UF #45) Greene also complained to the JPWLRC that he may have to be transported by others to get around the terminals, especially when he worked nights, or there was fog or rain, or windshield wiper issues, as it created vision difficulties for him and he was unable to do those jobs. (UF #46)

On or about May 10, 2023, Greene wrote to Gasset that he had requested to be reassigned from the shuttle bus driver to another post due to his disability and medical condition and requested that Gasset inform the personnel at Pier 400 that Greene should be reassigned. Gasset responded that he had no authority to do so and that if he could not do the job, Greene needed to "reap" out. (UF #47)

On or about May 22, 2023, the JPWLRC held a second meeting to discuss providing reasonable accommodation to Greene. During that meeting, Greene reiterated that he was not able to drive himself when the terminal was dark or on foggy days, bad weather, or rain, and someone would have to drive him around. Also, that vehicle inspection reports were a struggle for him as part of office work that he had requested to do. (UF #48)

///

///

9

**E.     Greene Caused Two Accidents Due to His Low Vision and Drove Company Vehicles in an Unsafe Manner Risking Injury or Death**

On or about June 12, 2023, Gasset advised Gratz that Sergeant Emmitt Hall at LBCT stated that Greene had been in a car accident involving a driverless Automated Guided Vehicle ("AGV") being piloted from the back and that Greene had sustained an injury for which he was going to be able to drive himself to the doctor. (UF #49) Greene caused the accident on June 12, 2023, by running head into the AGV which is about the size of a container chassis (40 feet) and 10 feet high on which containers can be temporarily placed. Greene apparently could not see it and ran into it, even with his lights on. (UF #50) LBCT filed an employer complaint 08-2023 against Greene for damaging company property. (UF #51) Gratz investigated the complaint, watched the LBCT video of the accident, reviewed information from Gasset and determined that the accident was Greene's fault. (UF #52)

On or about August 22, 2023, Greene was involved in a second accident, similar to the first, in which he drove his vehicle into another vehicle operated by the superintendent at APM Terminals (Pier 400). (UF #53) Gratz investigated this accident, viewed the videotape, and concluded that Greene was the cause of the second accident, which was the subject of employer complaint 0018-2023. (UF #54)

Based on the June 12, 2023 incident, Greene was placed on non-dispatch (meaning he could not be referred out for jobs) with LBCT based on the conclusion by LBCT and PMA that "Greene's dispatch to LBCT as a Watchman would currently pose a significant risk of substantial harm to the health and safety of himself and other persons on the terminal and that no reasonable accommodation can eliminate or reduce the risk to a safe level." (UF #55) Gratz investigated the employer complaint from LBCT and the Watchmen's Agreement violation at Matson Berth C-60 and the Watchmen's Agreement and concluded that Greene was unable to perform the essential functions of the Watchman

10

job. (UF #56) The PMA and Local 26 investigated and determined that Greene was found guilty of employer complaint number 8-23, which covered the damage to the remotely operated AGV at LBCT on June 12, 2023. (UF #57)

On or about December 10, 2024, the JPWLRC met to again discuss accommodating Greene's ADA request. Based on the conclusions by the Joint Port doctor, Dr. James Deutsch, the accidents which Greene had caused, and the unavailability of any accommodation that would allow Greene to safely and efficiently perform the Watchmen's position, the parties concluded they were not able to accommodate Greene's request that he bypass the dispatch system and receive a specific job at a specific location. (UF #58)

**F.     Both Greene's Treating Doctor and the Joint Parties' Doctor Concluded Greene was Unable to Drive or be in Uncontrolled Traffic Areas in the Ports**

Greene is and has been legally blind since 2023. (UF #59 and UF #64)

Greene's visual condition is permanent and there is no current medical procedure extant to regain his vision. (UF #65) Greene's treating doctor, Dr. Coleman, found that Greene's vision meets the standards for legal blindness. (UF #66) She considered a marine terminal involving cranes loading and unloading containers with a lot of moving vehicles to be unsafe and hazardous such that Greene should not work there. (UF #67) Dr. James Deutsch was the joint medical examiner for PMA and Local 26. (UF #68) Dr. Deutsch was asked to perform a fitness for duty examination on Greene, but Greene refused to do so. (UF #69) Dr. Deutsch issued a medical report in absentia based on Dr. Coleman's reports and concluded that that Greene should not drive any sort of motor vehicle and should not be present in areas where there is uncontrolled high traffic, which included areas where Greene would be working outside. (UF #70) Greene was medically prohibited by Dr. Deutsch from climbing ladders or gangways or performing any tasks requiring verification or identification and conducting visual inspections. (UF #71) Greene's visual

DEFENDANT ILWU LOCAL 26'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

restrictions include climbing ladders, working around heavy machinery in uncontrolled hazardous areas and no driving motor vehicles of any kind. (UF #72)

## III.

## ARGUMENT

### A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) aims to dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). To demonstrate a genuine issue, Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts. ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industry Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

Summary judgment is appropriate against a party who cannot "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Id*. at 323. Summary judgment does not require the absence of any factual dispute whatsoever. Rather, summary judgment is warranted where the record taken as a whole could not lead a rationale trier of fact to find in favor of the non-moving party. *See, e.g., Hanon v. Dataproducts Corp.*, 976 F.2d 497, 500 (9th Cir. 1992) ("[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986))).

///

///

///

12

**B.    The Accommodation of a Specific Limited Job Which Greene Seeks is an Undue Hardship Because It Violates Express Rights Established by a Collective Bargaining Agreement**

Creating a job for Greene at a desk inside a terminal watching a computer screen with magnifiers is not a form of reasonable accommodation. Allowing Greene to have a guaranteed "job" to bypass the seniority-based dispatch system and skip the majority of a Watchmen's essential functions will undermine the terms and conditions of the Collective Bargaining process as it has operated over the last 40 years, plus dismantle the dispatch system, as individuals attempt to "create their own deals" at specific terminals based on their preferences and whatever disability they can show.

The U. S. Supreme Court considered the impact of religious accommodation on the bona fide seniority system of flight attendants set forth in their Collective Bargaining Agreement. While stopping short of concluding that any impact to a Collective Bargaining Agreement and/or a seniority system would constitute an undue hardship, the high court stated that "TW was not required by Title VII to carve out a special exception to its seniority system in order to help Hardison to meet his religious obligations." *Transworld Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977).

*Hardison* was followed by the Ninth Circuit's en banc decision in *Balint v. Carson City*, 180 F3d 1047 (9th Cir. 1999). In that decision, the Court questioned whether the existence of a bona fide seniority system obviates the duty to reasonably accommodate the religious needs of an employee pursuant to Title VII. The Court held that mere existence of a seniority system does not relieve an employer of the duty to attempt reasonable accommodation of its employees' religious practices. The Court, in weighing the priorities of a bona fide seniority system as opposed to an individual's request for accommodation concluded that "under the reasoning of *Hardison*, the provisions of section 2000e-2(h) are not a defense <u>if reasonable accommodation can be made without impact on the seniority</u>

13

system (Emphasis added.) and with no more than a de minimis cost to the city." *Balint v. Carson City* at 1053. However, the Ninth Circuit also held that "employers need not transgress upon the seniority systems to make accommodations, but they are required to attempt accommodations that are consistent with their seniority systems and that impose no more than a de minimis cost." *Id*.

What constitutes undue hardship must be determined within the particular factual context of each case. *Balint* at 1054, citing *American Postal Workers Union v. Postmaster General*, 781 F.2nd 772, 775 (9th Cir. 1986). The Ninth Circuit conceded that undue hardships may also be present when an accommodation would cause more than a de minimis impact on co-workers, such as depriving co-workers of seniority rights or causing co-workers to shoulder the Plaintiff's share of potentially hazardous work. *Opuku-boateng v. California*, 95 F.3d 1461, 1468 note 11 (9th Cir. 1996); *Bhatia v. Chevron USA, Inc.*, 734 F.2nd 1382, 1384 (9th Cir. 1984).

In this case, there is no question that allowing Greene to pick an inside desk job for a full-time assignment and never have to work driving or in high traffic outside areas means that everyone else in Local 26 would have to shoulder those burdens. While some courts have recognized that an accommodation that would require an employer to violate the provisions of a Collective Bargaining Agreement constitutes an undue hardship as a matter of law. *Tunis v. Public Services*, 2026 U.S. District. LEXIS 45471 (D. NJ 2026), the Ninth Circuit requires an analysis to determine if any reasonable accommodation which the employer might offer would invade the legitimate expectations of workers under a Collective Bargaining Agreement. The threshold of undue hardship is not high. *Miller v. Port Authority of NY and NJ*, 351 F.Supp.3d 762, 788 (D. NJ 2018). An accommodation constitutes an "undue burden" if it would impose more than a de minimis burden on the employer. *Hardison*, *supra*, at 432 US 84; *Webb v. City of Philadelphia*, 562 F.3d 256, 259-260. Such a burden may take the form of economic costs that may also

14

include non-economic costs, such as damage to employee morale or compromise of a Collective Bargaining Agreement or seniority system. *EEOC v. Geo Group, Inc.*, 661 F.3d 265, 273 (3rd Cir. 2010); *EEOC v. Townley Engineering and Manufacturing Co.*, 859 F.2nd 610, 615 (9th Cir. 1988); *Fouche v. New Jersey Transit*, 470 F.Appendix 96, 96-7 (3rd Cir. 2012) (Affirming a grant of summary judgment where accommodation would have caused undue hardship on employer causing breach of seniority provision and Collective Bargaining Agreement); *cf. US Airways, Inc. v. Barnett*, 535 U.S. 390, 403 (2002) ("an employer need to adapt to an employee's special worship schedule as a 'reasonable accommodation' where doing so would conflict with the seniority rights of other employees."); *Harrell v. Donahue, 638 F.3d 975, 980* (8th Cir. 2011) (providing postal worker with Saturdays off with a burden co-workers with more weekend work). As the Court observed in *Miller*, *supra*:

> "Since *Hardison*, courts have uniformly held that compromise of a seniority system or violation of a Collective Bargaining Agreement is a cognizable form of undue hardship. Such an accommodation may create an undue hardship 'if it causes more than a de minimis impact on co-workers' as many cases have recognized."

*Miller* at 351 F.Supp.3d 762, 789 and cases cited at footnotes 22 and 23 therein.

There is simply no question that allowing Greene to cherry-pick his assignment removes a better assignment or assignments from the bargaining unit work which other workers are entitled to. The minimal amount of doing this has already created furor within the Local 26 workplace, as described by Gasset. (UF #4) Allowing Greene to directly deal with employers to obtain a preferred assignment, by removing work from the bargaining unit creates a path to utter disruption, as other Local 26 members directly deal outside the collective bargaining process with individual employers. It is only a matter of time before this wrecks the dispatch system, which is the heartbeat of the Union's collective

15

bargaining rights. With workers cutting deals, creating their own jobs by direct dealing with employers, it would not take long before the Union ceased to exist.

**C.    Greene is Not a Qualified Disabled Person Because He Cannot Perform the Essential Functions of the Watchmen Position With or Without Reasonable Accommodation**

Given that Greene can establish he has a covered disability, he must also show that he is "qualified" within the meaning of the ADA. 42 USC §12112(a); 29 CFR §§1630.2(m), 1630.4 and Pt. 1630, App. §§1630.2(m), 1630.4; *See Kennedy v. Applause, Inc.* (9th Cir. 1996) 90 F.3d 1477, 1480.

The ADA defines the term "qualified individual" as an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds. 42 USC §12112(8); 29 CFR §§1630.2(m), and Pt. 1630, App. §§1630.2(m).

An individual who cannot perform the essential functions of the job with or without reasonable accommodation is not "qualified" and the ADA does not come into play. *McKnight v. General Motors Corp.* (6th Cir. 2008) 550 F. 3d 519, 528; *Stanley v. City of Sanford, Fla.* (11th Cir. 2003) 83 F4th 1333, 1344 (cert. granted on other grounds).

It is factually uncontested that Greene cannot perform the essential functions of the job and no one has been able to articulate any accommodation that would allow him to perform the essential function of driving a motor vehicle. As set forth above in the Statement of Facts, numerous job duties set forth in the "M" language and in Articles 1, 2, and 7 of the Watchmen's Agreement require that the Watchmen perform driving functions of various sorts. Greene admittedly, and as a matter of proof from Dr. Coleman and Dr. Deutsch, cannot drive. Nor does his visual acuity permit him to safely and accurately evaluate individuals seeking to gain access to the terminals, inspect cargo properly, look for contraband, or several of the other functions identified above, according to Dr.

16

Deutsch. Accordingly, as a matter of law, Greene is not a qualified disabled person under state or federal law.

**D.     Greene's Accommodation is Per Se Unreasonable Because it would Violate Legitimate Expectations of Local 26 Workers Under Their Collective Bargaining Agreement and Destroy the Dispatch System**

Several cases hold that other workers seniority rights under a Collective Bargaining Agreement may trump a disabled employee's priority to an otherwise available work opportunity.

> "Reasonable accommodation does not require sacrificing the collectively bargained, bona fide seniority rights over the employees."

*Eckles v. Consolidated Rail Corp.* (7th Cir. 1996) 94 F.3d 1041, 1051; *Willis v. Pacific Maritime Association* (9th Cir. 2001) 244 F.3d 675, 680-681-an accommodation that violates a bona fide seniority provisions of a Collective Bargaining Agreement is per se unreasonable; *Boersig v. Union Electric Company* (8th Cir. 2000) 219 F.3d 1816, 822; *Davis v. Florida Power and Light Company* (11th Cir. 2001) 205 F.3d 1301, 1307; *Brigham v. Frontier Airlines, Inc.* (10th Cir. 2023) 57 F.4th 1194, 1200 (Flight attendants' requests to bypass airlines flight bidding system would have violated CBA and eliminate options of other flight attendants with greater seniority.)

**E.     Greene is a Direct Threat to the Health or Safety of Others in the Workplace, Including Himself**

An employer is permitted to discharge a disabled individual who poses a "direct threat to the health or safety of others in the workplace" that a reasonable accommodation cannot eliminate. (42 USC §§12111(3), 12113(a), (b); 29 CFR §§1630.2(r), 1630.15 & Pt. 1630, App. §§1630.2(r), 1630.15(b), (c); *Mayo v. PCC Structurals, Inc.* (9th Cir. 2015) 795 F3d 941, 944.)

DEFENDANT ILWU LOCAL 26'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

Greene has already caused two accidents at work while operating a motor vehicle during 2023. Additionally, he was found driving at a very slow speed under a working crane, which involved a risk of injury or death to himself, as driving under a working crane violates safety rules. In one of the accidents, Greene actually hurt himself and sought medical care. (UF #49) If he is allowed to keep working while blind, driving vehicles on terminal property, it is only a matter of time until he kills or seriously injures himself or others. Neither the employer nor the Union want this or want to allow this to happen if they can prevent it.

## IV.

## **CONCLUSION**

It is a highly regrettable situation that Greene has found himself in, given his increasingly deteriorating vision with no known cure. However, clearly, he cannot operate equipment safely, cannot drive, and has limited visual capability far below the acuity needed to perform the demanding work of protecting the terminals and the Port from unwanted personnel and threats to safety. For all these reasons, Local 26 respectfully requests the Court grant its Motion for Summary Judgment.

Dated:  June 18, 2026

Respectfully submitted,

LAW OFFICES OF MARC COLEMAN

By:   */s/ Marc Coleman*
          Marc Coleman
          Attorney for Defendant
          ILWU LOCAL 26, Union

DEFENDANT ILWU LOCAL 26'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

## Local Rule 11-6.2 Certification

The undersigned, counsel of record for ILWU Local 26, certifies that this brief contains 5,144 words, which complies with the word limit of L.R. 11-6.1.

By: */s/ Marc Coleman*
Marc Coleman

19

DEFENDANT ILWU LOCAL 26'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT